BOWDEN *et al.* v. ACHOR.

| 95 | 243 |
| 97 | 103 |
| --- | --- |
| 95 | 243 |
| 98 | 295 |
| 99 | 81 |
| 95 | 243 |
| 100 | 202 |
| 95 | 243 |
| 102 | 653 |
| 95 | 243 |
| 103 | 553 |
| 104 | 800 |
| 95 | 243 |
| 113 | 820 |
| 95 | 243 |
| f129 | 216 |
| 129 | 529 |

1. An equitable petition alleging that the plaintiff had been defrauded of certain described lots of land, or the value thereof, by a series of fraudulent and unconscionable acts perpetrated upon her by various persons. named as defendants, the petition setting forth in detail a history ·of these acts and thereby showing that each and all of the defendants had more or less connection with the same, and in effect charging that the wrongs done her in the premises were the result of a conspiracy among the defendants in which they all to a greater or less extent participated, and praying for appropriate relief as to each, was not demurrable for multifariousness, or for misjoinder of parties, or for misjoinder of causes of action.

2. One of the alleged grounds of fraud being that the consideration for which the plaintiff had been induced to part with and convey land was grossly inadequate, evidence of the value of the land at the time of the trial, which occurred years after the alleged fraud

had been committed, was irrelevant, especially where it appeared that all lands in that vicinity had, because of the building of a town, very greatly enhanced in value.

3. It is not admissible for a witness who is not an expert in such matters to testify to his opinion with reference to the mental capacity of another, without stating the facts upon which that opinion is based.

4. It is not only the right, but the duty, of the presiding judge in the trial of an action to ask questions of the witnesses whenever necessary to bring out the full truth of the case; but in so doing, he should not himself intimate any opinion upon the facts, or use any expression calculated to prejudice the rights of either party.

5. Where it appears that a material paper is outside this State, and therefore beyond the jurisdiction of its courts, a witness may, in the absence of better secondary evidence, be allowed to testify to its contents.

6. The charges being fraud and conspiracy, deeds or other evidence which may throw some light on the transactions under investigation are admissible, the value of the evidence being for the jury to determine. In admitting such evidence, it was not improper for the judge to remark, in substance, that he thought it "applicable," and that if it had no relation to the question at issue, it would do no harm.

7. The declarations of one in disparagement of the title he had once held to land, made after he had parted with the title and when he was not in possession, are inadmissible to affect those holding under him.

8. Where, plainly and beyond all controversy, there is one main, controlling issue in a case, the court may inform the jury that such is the fact; but if there are two or more important issues, and there is any doubt as to which is the main one, or that any one of them is such, the court should not single out a particular issue and present it as the controlling one in the case.

9. Where the court, in its charge, appropriately recited, by way of hypothesis, various facts illustrative of a want of mental capacity to contract, it was certainly not erroneous, as against the defendants, to add that if the jury believed such was the plaintiff's mental condition, and if they were thus *convinced* she did not have sufficient mental capacity to make a contract when she executed certain deeds, the same were not binding upon her.

10. It was error to charge that if the plaintiff, at the time of making certain deeds, had the mental capacity to contract, and there was no change in her mind for the worse when she afterwards made a certain other deed (the latter being a deed which, if binding upon her, would defeat her action), that deed would be no bar to her recovery. So manifest an error could have resulted only from inadvertence.

11. When the evidence consisted of answers to interrogatories and various documents, as well as the oral testimony of witnesses, the court should not have instructed the jury: "the evidence is what the witnesses swear before you on the stand."

12. Where the court stated to the jury three contentions of a party, it may have been misleading to add that so and so would result if "both of these positions are true," without specifying to which two of them the word "both" applied.

13. When the court has been duly requested to give its entire charge in writing, and the jury, after deliberating a while on the case, ask for additional instructions, which the court undertakes to give, these instructions must also be reduced to writing and read to the jury. If the court fails to do this, and gives the additional charge orally, it is reversible error. Section 244 of the code was not repealed by the act providing for the appointment of official court reporters.

14. Where one who has received money in consideration of land sold and conveyed seeks to rescind the sale on the ground of fraud, it is incumbent on the seller, before instituting legal proceedings for that purpose, to return, or offer to return, the consideration received. Even if, in a given case, there should exist equitable reasons for a failure to make restoration, or a tender thereof, which could be held sufficient to dispense with the same as a condition precedent to the right of action, certainly in a case like the present, where the plaintiff received money for her land and there is in her declaration no allegation that it was paid or tendered back, nor any offer therein of restoration, or its equivalent, and no evidence whatever either of payment or tender, a recovery by her of the land in question cannot be sustained.

15. Such of the fifty-seven grounds of the motion for a new trial as are not covered by the foregoing notes are not of sufficient importance to require special notice; many of them are exceedingly trivial; others are entirely without merit; some of them contain objections to evidence, tediously and unnecessarily spun out into lengthy colloquies between court and counsel, when they might easily have been clearly and concisely stated; others relate to alleged improper conduct of counsel in talking irrelevantly and too much, and the refusal of the court to interfere, and so on almost *ad infinitum.* It may be that some slight errors were committed which have not been noticed. In so complicated and protracted a trial, it would be surprising were it otherwise. On the whole, the controlling questions made by the record have been dealt with, and the rules of law applicable have been announced. January 14, 1895.

Equitable petition. Before Judge CLARK. Clayton superior court. March term, 1894.

The petition of Lou Achor alleged: She is the daughter of Nancy Wright who before her death owned lots 8, 9 and 24 in the 13th district of Clayton county, under deeds recorded October 16, 1886, each deed conveying one of the lots and each being on a consideration of $2,000. On September 28, 1887, Nancy Wright by will devised these three lots to petitioner, her only child. On October 18, 1887, two deeds were claimed to have been made by Nancy Wright, one to J. W. Turner to lot number 8, and the other to J. W. Wright to lot number 9. The consideration mentioned therein was love and affection, but the grantees were worse than strangers in sympathy for the grantor in her afflictions. These two deeds are forgeries, and were made for the sole purpose of defrauding petitioner. About the time of making them, Nancy Wright was in feeble health and without mental capacity to make a deed. Just after Nancy Wright's death, petitioner was desirous of recovering lots 8 and 9, and, acting upon the advice of J. M. Walker who had gained her confidence, she employed as her counsel S. N. Connally, contracting with him to give him one half of lots 8 and 9 for his services in recovering the property, and agreeing to sign a deed to one of said lots conveying to him the title thereto. Through the false and fraudulent representations of Walker, who was Connally's agent in the matter, she was induced to sign a deed conveying to Connally lot 24, which was not in litigation in any manner, but was left to her free of any encumbrance by her mother. This is a fraud upon her, she being ignorant and unable to read and write or to understand what she was signing. She had all confidence in Connally, and relied upon him to protect her from the numerous unscrupulous persons who were doing all in their power to obtain by fraud and violence the property left her by her mother. By this fraud Connally secured, without any contingency, $2,000 for his services in recovering lots 8

and 9; whereas, according to the terms of the contract, he was to get a contingent fee of one half of the recovery. Soon after petitioner employed Connally, he as her attorney filed two suits in ejectment to the spring term, 1887, of the superior court of Clayton county, against Turner and Wright. During 1888, and before the trial of these cases, she was, by and through the false representations of Walker, who was acting for and by the advice of Connally and who represented to her that she was about to be convicted and sentenced for larceny in Clayton county, forced, through fear of criminal prosecution, to leave that county and even the State of Georgia. She was never guilty of any crime as she was then charged with, but this was only a trick resorted to by Connally and Walker, who, with J. T. Spence, were in collusion to defraud her of her property, to remove her beyond the limits of Georgia, so they could with more ease accomplish their designs upon her, with her spirited away beyond hearing of said cases. Walker and Connally were largely indebted to Spence for assistance in their work of frightening away petitioner. Spence was indebted to petitioner for some favors theretofore granted, and she had every reason to believe he was her friend. Walker received a valuable consideration for his services in said matter, from the proceeds of the sale of lot 24 as hereafter set out. Spence received, as his part of the plunder from said robbery, a house and lot in Jonesboro, Clayton county, as the ultimate result of said transaction. After petitioner had been thus spirited away, Connally, without instruction from her, against her known wish and against her interest in the matter, dismissed the ejectment suits and did not even notify her of his actions in the premises nor of the disposition of the cases, nor communicate with her in any manner concerning them, although she had requested him through Walker to do so. She did

not learn of the dismissal of the suits until more than six months had elapsed after they were dismissed. If they had not been dismissed and had been faithfully represented by Connally, as was his duty, she would have recovered the lots sued for. Their dismissal was only a part of the scheme entered into by Walker, Spence and Connally, to defraud her out of her property. Connally acted in collusion with the opposite parties in said cases and dismissed the cases in their interests and in his own, abusing the trust she reposed in him as her counsellor, to perpetrate a fraud upon her. Since the dismissal of the suits by Connally, he has made a deed to lot 24 to L. A. Kuglar, who has since died, and Samps. Morris is his administrator. The consideration of this deed is expressed as $1,000. Kuglar bought with notice of the fraud above mentioned; and Spence was Kuglar's agent and legal adviser in said transaction, and he knew all of the fraud in connection with it and the rotten condition of the title to lot 24. Spence, taking advantage of the great confidence reposed in him as her friend, had her to sign a deed to Kuglar to the west half of lot 24, dated December 20, 1888, (the deed from Connally to Kuglar was dated March 6, 1889) on an expressed consideration of $700, but really without any consideration, she not having received a cent for the same. Spence represented to her that it would be greatly to her interest to sign the deed, and that the consideration should be turned over to her upon the delivery of the land to Kuglar. Spence received the consideration to himself and family in the shape of a house and lot in Jonesboro, as above mentioned. Spence was Kuglar's agent and legal adviser in this transaction, and Kuglar knew of the fraudulent and false representations and conduct of Spence to and with petitioner, and acted with all the lights before him. The deed of petitioner to Connally to lot 24 was known to Kuglar, and there was never

any conflict between Connally and Kuglar, which is a badge of fraud; and Kuglar knew Connally to be petitioner's then counsellor. On August 26, 1889, Kuglar made to Robert Bowden a deed to lot 24, for a consideration of $3,000. Bowden had notice of the fraud upon petitioner by Connally, Walker and others above mentioned, and the sale was made for the purpose of putting the title ostensibly in some one not affected with notice of a fraud upon petitioner; but said transfer and deed is a fraud upon her, for Bowden knew the title should rightfully be in her. She was induced to sign an instrument on November 9, 1891, which was represented to her to carry no title out of her and in no way to lessen her right or title to lot 24, and that she had no interest in the property that could in any way be affected by said instrument, but in fact it was a quitclaim, and confirmed the deeds made by her to Connally and Kuglar above mentioned. This quitclaim was executed in Alabama, the consideration mentioned in it being $100. Said consideration is not sufficient to support it. She was induced to sign it by said fraudulent representations of W. J. Albert and Samps. Morris, with and by the aid of Spence, legal counsel and adviser of Kuglar's estate, and who even now has a very great influence over the mind of petitioner. It was represented to her by said parties that her attorneys, whom she had long ago employed to sue for this property and who bring this petition, were not taking any steps in the matter to aid her in recovering the property, and that she could never recover it as she had no title to it. She was induced to sign the instrument under a misapprehension of her rights as to this property. The fact that she had already employed counsel to look after her interest in the property and to recover it for her, was well known to the parties who induced her to sign the instrument by their fraudulent representations above mentioned. She

was at that time in very feeble health and of very weak mental capacity, so as not to be able to tell or be conscious of her rights in the matter, or to understand the nature of the instrument she was signing. She is ignorant and weak-minded and has always been so; because of this and her feeble condition she was easily imposed upon, and is not of sufficient mental capacity to make a deed. Because of the dismissal of the ejectment suit for lots 8 and 9, and more than six months having elapsed before she could have instituted or reinstated her case, she is barred from suing for the recovery of these lots; and Connally, Walker and Spence are responsible to her for the value of said lots. Connally and Walker are liable to her for the value of lot 24, if the same should be held by an innocent purchaser ignorant of the fraud committed upon her by Connally and Walker. Lots 8 and 9 contain $202\frac{1}{2}$ acres each, worth from $40 to $60 per acre, and lot 24 contains $202\frac{1}{2}$ acres, worth the same. Connally's failure to prosecute and his dismissal of the ejectment cases have resulted in injury to her in a sum equal to the value of lots 8 and 9; and he has injured her in a sum equal to the value of lot 24, because of the fraud committed upon her by him and Walker, his agent and confederate, in securing her signature to the deed to Connally conveying that lot, in the event said lands should be in the hands of an innocent purchaser. She prays that Connally, Walker, Spence, Bowden, and Morris as administrator of Kuglar, be made parties defendant; that her deed to Connally, her deed to Kuglar, her deed of relinquishment to Bowden, Connally's deed to Kuglar and Kuglar's deed to Bowden be each set aside and cancelled; that title to lot 24 be decreed in her; that she recover from Connally, Walker and Spence, all or either of them, the value of lots 8 and 9; that she recover of Connally and Walker the value of lot 24, if that lot be found in the hands of innocent purchasers;

and for general relief. Attached as exhibits are copies of the instruments referred to. By amendment she alleges: Morris has in his own individual right come into possession of lot 24, and now holds it and claims it as his own. He refuses to deliver it to her or pay her the yearly profit thereof, it being worth for rent $250 per year. Kuglar was a party to the fraud by which she was deprived of the land. About the time when she was fraudulently ousted from the possession of her heritage, Kuglar, with his friend and legal adviser Spence, lurked in the vicinity of her land and home, and by fraudulent means contributed largely to the scheme of getting her out of Georgia and into Alabama. Kuglar furnished the money and hired the conveyances which moved her goods to Atlanta, and, at the instance of Spence, furnished the money with which to pay freight on her goods and her railroad fare out of Georgia. It was a part of the scheme concocted by Kuglar and Spence, that Spence was to see to it that she was to be moved out of Georgia and to the remote mountain regions of Alabama. As an additional circumstance to charge Kuglar with notice and participation in this fraud, subsequent to her removal from Georgia, although he then had a deed to the land, as he claimed, he was dissatisfied, and thinking, perhaps, to more completely cover up his fraud, he sought out Connally and accepted from him a quitclaim deed on a consideration less than the value of the land. This circumstance also seems to fasten knowledge of the fraud upon Connally, who well knew that he obtained his pretended deed in the manner charged in the original petition. Bowden never was a *bona fide* purchaser of lot 24, but the pretended conveyance by Kuglar to him was only a part of the scheme between him, Kuglar and Spence, whereby they hoped to get an innocent purchaser between them and their fraudulent conduct. The whole scheme was understood,

acquiesced in and indorsed by Bowden; and this view
is sustained by the fact that about November. 9, 1891,
Morris, with his attorney Albert, visited petitioner's home
in Alabama, and after securing the services and influ-
ence of J. M. Phillips, who was known by them to be
the friend and adviser of petitioner, falsely and fraudu-
lently represented to her that her attorneys could do
nothing for her, and by all kinds of misrepresentations
and fraudulent practices induced her to sign some kind
of paper, she did not know what, except that the same
was without consideration save the paltry sum of $100,
conveying the land. She has been informed and be-
lieves that the $100 was paid by them to Phillips, as the
price of his influence with her to induce her to sign
papers of their own drawing. She is now informed that
this last mentioned paper is claimed to. be a deed to
Bowden, but he was not present and she believes knew
nothing about it and has never even seen the paper. At
the time of the pretended sale by Kuglar to Bowden,
Bowden already owed Kuglar seven or eight hundred
dollars, much more than he could pay, and could not
well refuse to pose as an innocent purchaser from him
in this crisis. A man of Kuglar's well known closeness
in business would hardly have sold land to Bowden and
made him a deed, had there not been some private un-
derstanding that Bowden was merely the go-between
of the parties. Morris has procured to himself individ-
ually a reconveyance from Bowden of lot 24, hoping
thereby to add another name to the list of so-called in-
nocent purchasers, but Morris had full knowledge of all
these matters and took the land together with the fraud,
and became a participant therein. Morris was made
party defendant as an individual; and petitioner prayed
for a decree against him for recovery of lot 24 and
mesne profits.

1. Defendants demurred to the petition, on the ground

that it was multifarious; and for misjoinder of parties
and causes of action. The demurrer was overruled; and
under the evidence and charge of the court, the jury
found for the plaintiff land lot 24, placing thereon a lien
for $350 to satisfy fees due Connally; also, that the
$100 paid to Phillips be refunded to Morris, and that
plaintiff recover $50 per annum rent. Bowden and
Morris moved for a new trial, which was denied; and
they excepted. The grounds of the motion proper to be
here stated are, in brief, as follows:

2. Error in admitting testimony of three witnesses, as
to the present value of the land in controversy, to the
effect that it was worth from $25 to $50 per acre, that
it is worth more now than it was then, and that the
building of the town of Manchester had increased the
value of some property in the neighborhood from three
to five times what it was before; defendants objecting
that this was irrelevant.

3. Error in permitting Dodson to testify (over objec-
tion that no foundation for such testimony had been
laid, the witness not having stated anything that the
plaintiff did or said, going to show her incapacity to
contract) substantially as follows: I knew plaintiff when
I saw her; was not particularly acquainted with her;
have been about the house but few times; have known
her almost from a child. I was there a few times on
business, and from her remarks generally I thought she
was weak-minded. I think she could make a contract,
but do not think she was competent to discriminate as
to the value of the property. I do not think she had men-
tal power enough to make a contract for the sale of land
in all its parts—everything necessary, the price being a
part of the contract.—Also, in allowing Todd to testify,
over like objection: I held $110 for plaintiff at one
time. One night she came to my house to get me to
go to her house; said there was some one who had a

pistol and was demanding money. I went. I held a portion of those funds only a very short time. Lou first came and got $50; she next got $40; my wife gave her the money. Lou brought the money to me. There are certain kinds of sense. I think she had ordinary sense. I do not think she had any knowledge of legal papers. From the knowledge I have of her, I would not consider her capable of contracting in land transactions.—Also, in allowing Jones to testify, over similar objection: I have known Lou Achor since she was a child, pretty much. She was raised under quite ordinary circumstances, as far as any opportunity to know or learn anything,—just a harum-scarum kind of a girl; as far as I know, did not know one letter from another. I do not think she knew figures, or could tell anything about the amount of a bill, or could count up anything with any accuracy. She did not know letters or figures, and never had any schooling, in my opinion. I think, never having had any opportunity for any education or anything of that sort, and did not know how to tell a $1 bill from a $20 or $50 to know its amount,— my opinion is, that whites and blacks of that kind need a guardian. She might have sense enough to contract, but it might be no advantage to her. With the sharpers in this country, and taking her capacity, I think she would stand a dull chance for a fair showing.

4. Error in the judge asking witness Jones, "Did she have knowledge or mind enough to know the value of land?" and in admitting the answer: "I don't think she did; possibly for herself she wouldn't know whether she was making a good trade or a bad one." Also: witness Hill testified that plaintiff traded with him in a store to the amount of $2, dropped down a $20 bill and started away; that he asked her if she did not want her change, and she replied she did not know any was coming. On cross-examination Hill testified: "She made mistakes.

I was there the day she bought them things, and the time the $20 was given." Question: "Do you know how she came to make the mistake?" Answer. "No, sir." Q. "You didn't talk with her?" A. "No, sir." Q. "Haven't you done the same thing in your life, made a mistake in changing money?" A. "I don't recollect; I may have." By the court: "Did you ever make a mistake in buying $2 worth of goods and paying $20 for them?" A. "No, sir; never have been that green." Error is assigned on the propounding of this last question by the judge, as being an expression or intimation of opinion by the court on the evidence.

5. Error in refusing to allow W. J. Albert to testify, that the power of attorney shown him by Monroe Phillips on November 9, 1891, was from plaintiff, giving Phillips authority to bring suit for the land in dispute, or to compromise whatever right plaintiff might have in said land, but the right to sign conveyances being retained in plaintiff; and that Monroe Phillips was, on November 9, 1891, and ever since had been a citizen of Alabama. This was excluded on the ground that the power of attorney was the best evidence; defendants' counsel contending that as the paper was out of the jurisdiction of the court, its contents could thus be shown.

6. Error in admitting, over objection for irrelevancy, a deed from Mrs. B. C. C. Spence to Kuglar, of January 28, 1887, and a deed from Kuglar to Mrs. Spence, of January 18, 1889, each conveying land in Jonesboro; and in remarking in the hearing of the jury, on overruling the objection, "Well, I think it is applicable; the effect of it is another question. If it is not in relation, it will of course do no harm." Over like objection, the court allowed plaintiff to prove by S. A. Morris that, after payment of debts, the estate of L. A. Kuglar would turn out to be worth $8,000. This was admitted for the purpose of contradicting an answer of Bowden to a cross-

interrogatory by plaintiff's counsel, viz: "What did you want with a second deed, if your first was good; and why was not L. A. Kuglar's warrantee a good deed?" The answer was: "I was not certain as to whether the Kuglar estate was solvent or not; it was told it might not be," etc. Defendants objected further, that Morris's testimony could not be introduced to contradict Bowden on this collateral question, and that it was calculated to bias the jury against defendants' case.

7. Error in allowing J. B. McConnell to testify, in substance: I was in Alabama about three weeks ago, near where Bowden lived. He came to where I was, and stated that he had some sort of claim to this Wright property, and then went on to say that a man by the name of Kuglar or Spence took this negro Lou's husband and ran him off, and made her give him the deeds. He said something to the effect that Spence and Kuglar had been down to Lou's house buying this land. He said the whole thing was a fraud.—The objection was, that the title had passed out of Bowden nearly two years before the alleged disparaging statements.

8. Error in charging the jury: "The most important question you have to determine from the evidence in this case, is the mental capacity of the plaintiff at the time she made the deed to Connally and at the time she made the deed to Kuglar."

9–12. Error in charging as shown in the 9th, 10th, 11th and 12th parts of the opinion.

13. Before the evidence closed, defendants submitted to the court a written request to put the charge to the jury in writing. This was done, and the charge so written was read to the jury by the judge. Afterwards the jury returned and asked for additional instructions, which the court gave in part from the written charge and in part outside thereof and orally. Error was assigned, because the court should have reduced the additional charge to

writing before delivering it to the jury. (The additional instruction was taken down stenographically and written out afterwards, and is contained in the whole charge made a part of the record.)

14. Error in refusing to charge, as requested:

"If you believe that on November 9, 1891, Lou Achor executed a deed to Robert Bowden, and if you further believe that Monroe Phillips was in that transaction acting as her agent, and if the money was paid to Phillips by her direction, and if she was capable of contracting, then she cannot recover lot of land 24, or any part thereof.

"If you should believe from the evidence, that at the time said contract of sale and purchase was made, by which Kuglar got a deed to the land in dispute, plaintiff did not have sufficient mental capacity to make said contract, then, before she can recover, she must have paid back or have tendered back to Kuglar, or his administrator, four hundred dollars received or paid Spence by her consent, before filing this suit or pending the trial of the same.

"If you believe from the evidence in this case, that Mr. Bowden, or any one for him, after purchasing the land sued for, went to Alabama and paid the plaintiff or her agent for her one hundred dollars, and took from her a deed confirming her former deeds to this land, I charge you that before plaintiff could set aside the deed thus made, she would be obliged to pay back the one hundred dollars paid her or her agent, or tender the same back; and if she has neither paid nor tendered the same back before bringing this suit, she cannot recover in this action, and you should find for the defendants."

W. J. Albert and J. S. Boynton, for plaintiffs in error.
Hutcheson & Key and Doyal & Doyal, *contra.*

v 95-17

LUMPKIN, Justice.

We have directed the reporter to prepare a condensed statement of so much of the record as may be necessary to an understanding of our rulings in this case. The facts are somewhat complicated, and the pleadings are voluminous, but none of the legal questions · presented are very difficult. Indeed, many of the propositions announced in the head-notes are axiomatic. The chief trouble we have encountered in dealing with the case has been to master the record, which, by reason of much tedious and unnecessary detail, and the raising by counsel of many small and frivolous questions, has required the exercise of much patience and the consumption of much precious time.

1. An examination of the plaintiff's petition will show that she claims to have been defrauded of her property by a series of transactions which involved her in a complete network of fraud, in which all the defendants were more less concerned. All of them did not participate directly in all of the alleged fraudulent acts, but the acts of each were so connected with the acts of the others, as to make them all necessary parties to a proceeding to undo the consequences of all the frauds alleged to have been committed, and render complete justice and relief to the plaintiff. The prayers of the petition were sufficient to accomplish this end, appropriate relief having been asked as to each wrongdoer.

It must be understood that we are now dealing with the demurrer, for which purpose the allegations of the petition are taken as true, we not undertaking, of course, to say that they are so in fact. We think the demurrer, on the grounds taken, and which are indicated in the first head-note, was properly overruled. A somewhat analogous case is that of *Cohen & Co.* v. *Wolff & Buchwald et al.*, 92 *Ga.* 199. There it was held, that a number of plaintiffs, each having a separate interest in

his own claim but all having a common interest in defeating alleged fraudulent mortgages executed by a common debtor, should have been permitted to join in one action against that debtor, and each to obtain the relief to which he was severally entitled. Here the plaintiff brings together several defendants who have combined to defraud her, each, however, having his own separate interest in the fruits of the fraud they had perpetrated; and we think she should be allowed to sift the matter out to its legitimate legal and equitable consequences, and obtain from each of the conspirators the relief she ought to have against him.

2. A purchase of land, so far as the consideration is concerned, may be perfectly fair to the seller at the time of the sale, and yet the same land may, within a few years, or even less time, become very much more valuable. This is a matter of common knowledge. Consequently, the value of the land at the time of a trial to rescind a sale for alleged inadequacy of consideration cannot fairly throw light on the question of its value years before, especially where there has been a very great and rapid enhancement in the values of all lands in that vicinity because of the building of a town. Evidence of this kind is not only irrelevant, but may very seriously and unjustly injure the defendant by arousing against him a prejudice in the minds of the jury.

3. The rule announced in the third head-note is too well established to require any discussion at our hands.

4. We deem it unnecessary to apply to the special facts of this case the rule stated in the fourth head-note. It seems that numerous instances occurred during the trial when the presiding judge exercised his right to ask questions of the witnesses. In so doing there was, of course, no impropriety, unless he so framed his questions as to intimate an opinion of his own upon the facts, or used some expression calculated to prejudice the rights

of either party. It would be unprofitable to scrutinize closely the various colloquies occurring between the judge and the witnesses at the trial under review, for the purpose of determining with absolute precision whether he erred in the manner indicated or not. If he did, we are perfectly sure that this eminent and upright jurist did not do so intentionally, and it is not in the least probable that the occurrences of that trial will be repeated at the next. Indeed, such a thing is hardly within the range of possibility.

5. Where a paper of any kind is material as bearing upon the issue under investigation, the paper itself is generally the best evidence of its contents. Secondary evidence may be resorted to when the original is inaccessible. The courts of this State have no power to compel the production of a paper in the possession, custody or control of a person in another State, when such person is not a party to the cause. In such an instance, the paper may well be said to be inaccessible. If it were a duly recorded paper of which a legally certified copy could be obtained, it might be incumbent on the party desiring the benefit of this evidence to produce such copy; but where no such secondary evidence is obtainable, a witness may be permitted to testify to the contents of the original, if within his personal knowledge and he is competent to do so. In this connection see *Lunday et ux.* v. *Thomas et al.*, 26 *Ga.* 537.

6. The charges of fraud and conspiracy in this case were very wide and sweeping. Certain deeds and other evidence were offered, but objected to as irrelevant. At first glance, the objection would seem to be good; and at best, the evidence in question was, apparently, of but little value in throwing light upon the transactions under investigation. We are not, however, after a study of all the evidence, prepared to say that which we are now considering was totally irrelevant, and therefore think

it was properly admitted, it being for the jury, of course, to determine what weight to give it.

In admitting the evidence referred to, the judge remarked he thought it was "applicable." Exception to this remark was taken, it being alleged that this amounted to the expression of an opinion by the judge upon the evidence. This complaint, we think, is rather hypercritical, for it is evident that the word quoted was used in a sense synonymous with "admissible," for the judge immediately added that if the evidence had no relation to the question at issue, it would do no harm.

7. A party who has once had a title to land, and who has sold and conveyed the property and gone out of possession, will not be permitted to "talk away" the title of another holding under him or his vendee. Consequently, declarations of such a party, made after his connection with the title has ceased and at a time when he is not even in possession, in disparagement of the title under which he formerly claimed, are inadmissible to affect his successors. This is another well settled rule which will be recognized without argument.

8. In charging the jury, the court stated that the most important question they had to determine from the evidence in the case, was the mental condition of the plaintiff at the time she made certain deeds. We are inclined to think that this was undoubtedly true; but as there were a number of important issues involved in the trial, it would, perhaps, have been better for the court not to have said this. Indeed, the judge should never single out and present to the jury, as the main or controlling question in the case, a particular issue, unless, beyond all doubt or controversy, it is such in fact.

9. The court instructed the jury that if the plaintiff was partially imbecile in mind, and if "this partial imbecility consisted in her mental inability to understand the value of her property; to be in such a state of mind

as that she would do what any friend would request her to do in respect to the disposition of her property; that she did not understand her rights; that she was mentally unable to protect herself in her negotiations with others in respect to her property; that she did not understand the value of money, and that she did not know one coin from another, or one bill of currency from another," and if they believed from the evidence this was her mental condition, and were thereby *convinced* she did not have sufficient mental capacity to make a contract, she would not be bound by certain deeds she had executed, and they would not stand in the way of a recovery by her. We see no error in this charge, as against the defendants. It hypothetically stated facts which, if true, would show a want of mental capacity to contract, and then, in effect, instructed the jury that if they were convinced of such want of capacity, the fact of having executed the deeds in question would not defeat her action. The use of the word "convinced" might have operated a little too strongly against the plaintiff, but there was nothing in the charge of which the defendants could properly complain.

10. The error pointed out in the tenth head-note is so obvious that it will appear at a mere glance. The words "no bar," in the phrase "that deed would be no bar to her recovery," should evidently read "a bar." Were it not that this phrase appears precisely the same both in the copy of the motion for a new trial and the copy of the charge of the court, we would be strongly inclined to think a clerical error had been committed. As it is, we are quite certain the error was the result of mere inadvertence.

11. In this case some of the evidence consisted of answers to interrogatories; various documents were introduced, and quite a number of witnesses were examined on the stand. It was therefore error for the judge

to instruct the jury that "the evidence is what the witnesses swear before you on the stand." See *McLean* v. *Clark et al.*, 47 *Ga.* 26, twelfth head-note.

12. The court charged, among other things, as follows: "Counsel for the plaintiff take the position, that although the state of her mind might not have been such as to incapacitate her from making a contract, yet she was a person of weak mind, and she sold the land for a grossly inadequate price, and that there was a great disparity of intellect between her and the persons who took her deeds. If you should believe from the evidence that both of these positions are true, then you would be authorized to set aside the deeds . . .; but if you do not believe both, you would not be so authorized." His honor was evidently attempting to give in charge to the jury the substance of section 3179 of the code; but as the instruction quoted was capable of being construed into a statement of three contentions by counsel for the plaintiff, the phrase "both of these positions" may have been misleading.

13. In support of the ruling announced in the thirteenth head-note, it is only necessary to cite the case of *Harris & Mitchell* v. *McArthur*, 90 *Ga.* 216, which follows a long line of previous adjudications by this court to the same effect. The law providing for the appointment of official court reporters may offer good reason for a repeal of section 244 of the code; but as matter of fact, that section has never as yet been repealed by the legislature.

14. In the fourteenth head-note we have carefully endeavored to state the well known rule requiring one who seeks the rescission of a contract on the ground of fraud, to restore or offer to restore the consideration received, as a condition precedent to bringing the action. In *Strodder* v. *Southern Granite Company*, 94 *Ga.* 626, it was cautiously intimated, but not decided, that there

might be an exception to this general rule resulting from inability, by reason of poverty, to restore. We do not mean to now decide whether or not an exception to the rule announced may exist for such a reason as that above indicated, or for any other, because no such question is now presented for adjudication. But we do hold without hesitation that, under the pleadings and evidence in the case before us, the verdict in the plaintiff's favor was, for the reasons stated in the head-note, absolutely without legal justification.

15. In the last head-note, we have indulged in a modest protest against the manner in which this case was tried and the motion for a new trial prepared. What we say there is by no means exhaustive of the objections we might have stated to this manner of trying and bringing up cases. In all seriousness, counsel might have spared themselves much worry and annoyance, and have saved this court much unnecessary labor, by pursuing a different course. The writer once heard one of the most distinguished and successful lawyers who ever lived in Georgia facetiously remark that the questions in a noted case were divisible into "pints" and "pintees." We would be very much obliged if our professional brethren would hereafter omit the "pintees," or at least the most trivial and unimportant ones.

*Judgment reversed.*