## 19755. GARY *v.* CENTRAL OF GEORGIA RAILWAY CO.

PER CURIAM. The answer and the amendment thereto, filed at the eighth or ninth term of the court, were too late, and the court erred in refusing to strike them. The general rule is that all pleas must be filed at the first term (Civil Code of 1910, §§ 5630, 5635, 5628) ; and while it is true that where a case susceptible of being marked in default is not so marked, and no order is taken declaring it in default, a plea may be filed after the first term (*Gordon* v. *Hudson*, 120 *Ga.* 698, 48 S. E. 131), yet where, because of the timely filing of special and general demurrers to the petition, the case can not be marked in default, a different rule applies, and the defendant is then restricted to the particular defense or defenses already made, with such aid only as can be derived from proper amendments thereto. *Harper* v. *Tennessee Chemical Co.*, 37 *Ga. App.* 433 (4) (140 S. E. 408) ; *Brooke* v. *Lowry National Bank*, 141 *Ga.* 493 (4), 496 (81 S. E. 223). In the instant case the amendment to the petition did not materially change the cause of action, and therefore did not open the petition to an answer. *Brooke* v. *Lowry National Bank*, supra. Furthermore, the answer was of a dilatory nature, and such a plea must always be filed at the first term. Civil Code (1910), § 5641; *Hall* v. *Tiedeman*, 141 *Ga.* 602 (2) (81 S. E. 868) ; *Horne* v. *Rodgers*, 103 *Ga.* 649 (30 S. E. 562). The facts of the instant case bring it within the general rule that all pleas, and especially dilatory pleas, must be filed at the first term. The error in refusing to strike the answer and the amendment thereto rendered the further proceedings in the case nugatory.

*Judgment reversed. Broyles, C. J., and Bloodworth, J., concur. Luke, J., dissents.*

DECIDED JULY 31, 1929. REHEARING DENIED AUGUST 23, 1929.

*W. D. Lanier, W. K. Miller*, for plaintiff.
*W. Inman Curry*, for defendant.

LUKE, J., dissenting. By direction of the court I have written the decision reversing the judgment of the trial court. I do not agree to the judgment of reversal. The record in the case is substantially as follows:

On August 30, 1926, J. M. Gary brought his action for damages against Central of Georgia Railway Company. The court sustained the demurrer to the petition and dismissed the case. On February 20, 1928, this court reversed the judgment of the trial court. 37 *Ga. App.* 744 (141 S. E. 819). When the case was returned for trial the defendant, on April 20, 1928, for the first time filed an answer to the action. This answer was subsequently amended. The plaintiff moved to strike said answer because it was filed too late. This motion was overruled, and the movant excepted pendente lite. On May 24, 1928, the jury found for the defendant.

The plaintiff's motion for a new trial was overruled, and he excepted.

The substance of the petition follows: J. M. Gary was in the employ of Central of Georgia Railway Company from October 1909, to August 8, 1924, first as fireman, and then as locomotive engineer, under a contract of employment negotiated for him by his authorized agent, the Brotherhood of Locomotive Engineers, of which he was a member in good standing when discharged on August 8, 1924. The contract between the defendant and said brotherhood was entered into on December 22, 1922. Article 31 of said contract provides: "(a) No engineman shall be demerited, suspended, or discharged from the service of the company without a fair and impartial trial, investigation to take place before the train master and master mechanic, or their representatives. He will be notified of charges for investigation and be allowed to be present and hear evidence. If he desires he may have two enginemen with him, and, after evidence is taken, such representatives will have the right to discuss the points in the case with the officials. If exonerated, he will be paid for the lost time. In case of discipline, he will be notified in writing within ten days after the investigation. Unless complied with, there will be no entries made. Enginemen will not be held off runs for minor violations, provided investigation can be held within ten days. Enginemen will be notified promptly by letter or otherwise when they have committed a violation of rules.

"(b) Discipline will be applied within thirty days after date of notice. No complaints or appeal will be entertained unless presented in writing to the superintendent within thirty days after its occurrence. Enginemen shall have the right to appeal, provided, such appeal is made in writing within thirty days after the superintendent has rendered his decision.

"(c) Upon request the engineman who has been disciplined will be furnished a copy of his own statement pertaining to such investigation.

"(d) Except in cases of extreme emergency, enginemen will not be called to attend investigations immediately after having been on duty for a period or trip until they have had the amount of rest required by the sixteen-hour law.

"(e) Division officers will furnish General Chairmen with copy of investigation where discipline is applied when requested." On August 8, 1924, the plaintiff received the following letter dismissing him from the defendant's service: "Mr. J. M. Gary, Engineer, Augusta, Ga. Dear Sir: Referring to the investigation held at Augusta at 4:30 p. m., August 6th. Your record was charged with ten demerits for delaying train No. 47 at Millen and for refusing to give the operator at Millen and the dispatchers necessary information for the proper handling of your train, and for blocking second No. 37 at Millen unnecessarily. These ten demerits added against your record gives you ninety (90) demerits, which automatically relieves you permanently from the service. . . Yours truly, W. H. Wright, Superintendent."

The petition further alleged that the plaintiff's said discharge from service was illegal, because it was within the time he had the right to appeal both from said investigation of August 16, 1924, and from said order of dismissal; that his appeal, though duly entered, was ignored; that he did not have ninety demerits, but that even if he had, he could not be "automatically" discharged under said contract without a fair and impartial trial, and that he had been accorded none.

The petition further alleges: "The following is a list of demerits . . against which appeals from plaintiff were pending and undisposed of at the time of said illegal discharge except item one:"

1. Carried over from January 1, 1924..................10

2. April 28, 1924, inattention to duty resulting $150 damage to engine-tank at Millen April 20.........................30

3. April 30, 1924, rough-handling train 48 at Waynesboro..15

4. May 10, 1924, violating rule 1,000 "in allowing his engine to pop off while passing two layover sleepers at Millen on April 26".................................................15

5. June 9, 1924, violation of General Rule E and Rule 990, train 48, May 16.......................................10

6. July 30, 1924, "for delay to second 37 at Millen, and for cursing at operator Trapnell, and for refusing to give dispatcher on duty information as to when he would be ready to move his engine violation of rules 900, 800, and 802"..................10

The petition further sets forth what the plaintiff claims to be the truth in regard to the various demerits charged against him, the purpose being to show that they were given him illegally, and that he was discharged without being accorded his rights and privileges under section 31 of said contract. Various items of damages were next alleged, but, under the decision of this court when the case was here before, "full pay at the contract price" from the date of plaintiff's discharge to the time of the bringing of his action is the true measure of recovery. By amendment on February 15, 1927, plaintiff attached to his petition, as exhibits, copies of his appeals, the originals of which were "on the dates named" delivered by mail to the defendant's superintendent. It was also alleged that the plaintiff was not notified in writing of any discipline "ten days after the investigation;" that no date was fixed "after which discipline was to be applied;" and that said contract was violated in these particulars. On June 30, 1927, the petition was further amended substantially as follows: In addition to his damages of $6,260, measured by his earnings from the date of his discharge to the time of the filing of the petition, he was damaged in the sum of $5,710.91, which he would have earned from the date of the filing of his petition to the date of trial. By reason of the plaintiff's "long period of clear record," the demerits given him were excessive and unwarranted. Another amendment to the petition was as follows: A copy of a letter dated June 9, 1924, from the defendant's superintendent to the plaintiff showed that said superintendent refused to consider appeals from the in-

vestigations of April 30, 1924, and April 24, 1924, because the plaintiff's record showed that he had stated that he did not desire a representative at the trials. "This was no part of his complaint against the trials had. Each appeal was against the findings on the merits, and each appeal stated to the superintendent what the issue raised before him was." "Thus, as to Waynesboro, petitioner's appeal of May 10, 1924, stated that he had not violated any rules, was not given sufficient time to prepare for trial, and was not allowed to have two of his witnesses present." "Again at Millen, May 15, 1924, petitioner by his appeal denied" violation of Rule 1,000, stated that he did not have time to prepare his case, averred that he was tried by two personal enemies, and set out that his appeal was denied by the superintendent because plaintiff had not asked for a representative, when the superintendent himself was the "final contractual representative of all parties, . . to whom the appeals had to be made."

In his answer the defendant admitted that the contract of December 22, 1922, was of force, and that the plaintiff was an engineman operating under that contract; admitted giving the defendant the said demerits, but denied that any appeal was pending or undisposed of, or that any was ever filed; and either denied, or put plaintiff upon proof of, the other material allegations of the petition. The defendant further pleaded that "on May 26, 1911, through circular No. 16, the Central of Georgia Railway Company, at the request of the Locomotive Engineers, Firemen, and Hostlers, and upon the insistence of the Brotherhood of Locomotive Engineers, incorporated the 'Brown System' of discipline;" that the said system was in effect and the plaintiff was operating under the same.

By an amendment filed and allowed on May 12, 1928, the defendant pleaded "that as a part of the contract of December 22, 1922, and in paragraph (L) of article 29 on page 58," it was agreed that "letters from the management in regard to compensation and working conditions will remain in effect;" and that "circular 16 was a letter from the management in regard to compensation and working conditions, and was in effect during the entire employment of J. M. Gary." This amendment further alleged that plaintiff was familiar with said circular, and that he "is not now, and has

not been for some time past, in good standing in the Brotherhood of Railway Trainmen," and is not entitled to any benefits since he ceased to be a member of said brotherhood.

Those parts of "circular No. 16" hereinbefore referred to, and pleaded by the defendant, which bear most directly upon this case are substantially as follows: "Effective July 1, 1911, efficiency will be maintained by reprimand, demerits, or dismissal from the service in case of the following employees: conductors, engineers, etc." "An individual account will be opened with each employee on a card record kept . . in the office of the superintendent of each division. An entry will be made on such record in each case of neglect of duty, violation of the rules of good practices, accidents, improper conduct, etc., the same to be·determined by the superintendent." "Reprimands, as well as a given number of demerits, will be noted on the record of employees even though they are not subjected to loss of time." "A perfect record is one against which no unfavorable entry has been made. A clear record is one on which unfavorable entries have been canceled." "Any employee may examine his record at the superintendent's office, and if not practicable so to do, a transcript of his record will be sent him upon request." "A reprimand or demerit will not be noted against an employee's record without written notice to him." "Not less than five demerits will be assessed, and in multiples of five, but in no case to exceed thirty demerits for any one offense." "Reprimands and demerits placed against the record of an employee will be canceled by satisfactory service for various periods, as follows:"

(a)  Reprimand canceled by clear record three months.

(b)  5 demerits canceled by clear record six months.

(c)  10 demerits canceled by clear record nine months.

(d)  30 demerits canceled by clear record one year.

(e)  60 demerits canceled by clear record eighteen months.

"An accumulation of ninety (90) demerits will be taken as evidence that the employee is not rendering satisfactory service, and suspension from duty will follow, at which such time the entire record will be reviewed and such further action taken as the circumstances warrant."

"Disloyalty, dishonesty, desertion, immorality, insubordination, incompetency, wilful neglect, inexcusable violation of rules resulting in endangering or destroying company property, making

false statements, or concealing facts concerning matters under investigation, will, as heretofore, subject the offender to summary dismissal." "No change will be made in the practice of consideration of offenses by the superintendent, and ordinarily no action will be taken until investigation is completed. In cases of intoxication on duty, insubordination, or vicious conduct, employees will be taken out of the service pending final decision." "All records of discipline applied to employees named prior to July 1, 1911, will be canceled and not further considered with the adoption of the new system of discipline."

(Signed) "J. T. Moise, General Manager."

By an amendment allowed May 21, 1928, the defendant further pleaded that the plaintiff worked under the Rules and Regulations of the Transportation Department of the Central of Georgia Railway Company, and that Rule 800 is as follows: "Civil, gentlemanly deportment is required of all employees in their intercourse with the public, their subordinates, and each other. Boisterous, profane, or vulgar language is forbidden. . ." This amendment further alleged that Rule 801 reads: "Employees who are dishonest, immoral, quarrelsome, or otherwise vicious, will not be retained in the service." Defendant further pleaded the following rule, numbered 802: "All employees must devote themselves exclusively to the company's service, attending to their duties during prescribed hours, . . and obeying promptly instructions of executive and general officers, and those heads of departments in matters pertaining to their respective branches of the service." Defendant pleaded also that Circular No. 16 provides: "Disloyalty, dishonesty, desertion, intemperance, immorality, insubordination, incompetency, wilful neglect, inexcusable violation of rules resulting in endangering or destroying company property, making false statements, or concealing facts concerning matters under investigation, will, as heretofore, subject the offender to summary dismissal." The plea stated that at the investigation held on August 6, 1924, it was disclosed that the plaintiff violated each and every one of the foregoing rules; that he was given a fair and impartial trial at this and all other investigations; and that he was found guilty by the investigating board and dismissed after "the Superintendent had reviewed the papers in said investigation." It was further pleaded in this amendment to the answer that "the

---

labor unions through whom the contract of December 22, 1922, was made and entered into were the representatives of their members only for the purpose of securing for members fair and just wages and good working conditions, and did not have the right to contract for services to be performed for any definite period by this plaintiff;" and there was no contract between the plaintiff and the defendant that would sustain the action. The defendant further pleaded "the transportation act of 1920," enacted by the Congress of the United States, and providing that disputes and disagreements growing out of personal grievances, etc., which can not be adjusted by direct conference between the representatives of the individual railroad and its employees, shall be heard before a board in Washington; and that the plaintiff could not proceed "without showing that he had exhausted his rights before said board of adjustment."

J. M. Gary testified: that he was working for the defendant as an engineer under the contract of 1922; that ten days after he was tried on August 6 he was discharged; that he was never tried on the question of discharge, though he sought a trial; that he was discharged before he had time to appeal; that he wrote the superintendent on August 15 that he wished to enter an appeal because he had no representative at the trial and was tried before two enemies; that the charge against him was not true; that he was tried within three hours of his release from a fifteen-hour run; and that he never heard from his appeal. Plaintiff then took up the charge of June 9, 1924, for violating General Rule E and Rule 90, train 48, May 16. He denied that he was guilty of the charge, averred that he was tried before a personal enemy, who would not allow him to get his witnesses, and asserted that he entered his appeal upon the ground that he was not allowed to have his witnesses present, and was tried before two of his personal enemies. The superintendent's reply to his appeal was that he had stated at the investigation that he did not want a representative. The same reply was made to the plaintiff's appeal from the investigation as to his engine "popping off in passing sleepers at Millen." (At this stage of the case a letter dated May 14, 1923, from the superintendent to the defendant, congratulating him upon his good work, was introduced.) The plaintiff further testified that he was not guilty of "rough handling" the train at Millen; that he had no proper investigation

before the trainmaster and the master mechanic, but that the former alone, who was incompetent, illegally held it. The plaintiff wrote the superintendent on May 10, 1924, that he wished to appeal his case because he was only notified two hours before the time of the investigation, because the brakeman and fireman were not allowed at the investigation, and because he had no representative present. He next denied that he damaged the engine-tank in the sum of $450 at Millen, and that his appeal had been denied. Certain rules from "Central of Georgia Railway Company Rules and Regulations of the Transportation Department, Revised Edition, May 1, 1916," were introduced in evidence, among which were the following rules:

"801. Employees who are dishonest, immoral, quarrelsome, or otherwise vicious, will not be retained in service."

"803. Employees who are careless of the safety of themselves or others will not be continued in the service."

Rule 835 prohibited the "rough handling" of trains.

"1001. Must exercise caution and good judgment in starting and stopping trains to avoid violent or sudden movements which might cause discomfort to passengers or damage to property."

Rule 800, forbidding "boisterous, profane, or vulgar language, and altercations by employees," was also introduced in evidence.

Plaintiff further testified that he did not unnecessarily delay his train at Millen; that he did not use profane or vulgar language on that occasion; that he had been working under the "Brown System of Discipline," but that the "other contract superseded it;" and that his record showed that he had "clean records" from October 4, 1915, to January 27, 1918, from January 27, 1918, to April 10, 1922, from April 10, 1922, to July 23, 1923, and from July 23, 1923, to April 28, 1924.

J. R. Burney, sworn for the defendant, testified that he was one of the officers conducting the investigation for violations of rules at Tennille; that he had no animosity against the plaintiff; that the trial was fairly conducted; and that the fifteen demerits given the plaintiff were warranted by the evidence. J. A. Perkins testified that as road foreman of engines for the defendant he held the investigation regarding the Tennille incident; that at the first investigation plaintiff wished further time to get witnesses, and that a second investigation was held in order to allow him to do so; that he was present at the defendant's trial for damaging engine-

tank in the sum of $450, and that the plaintiff was represented; that the investigation at Waynesboro was held by the trainmaster alone because the matter involved did not concern the "locomotion department;" that as to the Millen matter the plaintiff said he did not want any representative; that he was present at the Millen investigation; that he had no hard feeling towards the plaintiff, but that in Augusta the plaintiff cursed him for every sort of a son of a bitch; that witness was given forty-eight hours to get his witnesses for the Millen investigation, but had none present. A. L. Ellas, for the defendant, testified that he acted as trior in the Millen case when the plaintiff was demerited for damages to engine-tank, and that the investigation was full and fair. C. A. Reinhart, trainmaster, testified that he held several of the investigations in question; that they were fairly conducted; the plaintiff was given time to prepare for trial and have representatives present; that witness conducted the investigation of May 10, 1924, alone, there being "no mechanical fact involved in the transaction;" that the plaintiff could have also had a master mechanic preside if he had so requested. R. C. Brinson, for the defendant, testified in substance as follows: Witness was conductor on the train at Millen when Mr. Trapnell asked the plaintiff about blocking "37," and plaintiff asked Trapnell, "if it was any of his God damn business." Trapnell, who was the station agent, told the plaintiff the dispatcher wanted to know when he was going to leave, and the plaintiff replied: "Tell the son of a bitch when I start off I will be ready to leave." Witness told the plaintiff he was having so much trouble on that run that he was likely to lose his job, and that he should make a change. Plaintiff said it was a good run. Witness told him to go to Wright or Reinhart and admit he was doing wrong and get the matter straightened out. Plaintiff said "he wouldn't knuckle to any son of a bitch." The witness further testified that the train was unnecessarily delayed by the plaintiff at Millen.

A. W. Anderson, vice-president and general manager, testified that the defendant had agreed to, and was operating under, the agreement creating the "Train Service Board of Adjusters;" and that this board hears complaints when the local committee wishes to take them up, unless the case is too plain against the employee. Fred Trapnell, for the defendant, testified that he was ticket agent

and operator for the defendant at Millen in August, 1921, and that it was his duty to give the train dispatcher any report he wanted regarding the movement of trains; that the dispatcher phoned witness to find out the cause of the delay of the plaintiff's train; and that when he asked the plaintiff when he was going, the plaintiff said: "Well, you tell that son of a bitch it is none of his business. When you see me going, I will be going."

W. H. Wright testified that he was the defendant's division superintendent when the plaintiff was discharged, and was familiar with the several cases involving the plaintiff; that "as these things occurred and were investigated the papers came to my office and were reviewed thoroughly by me and invariably discussed with the trainmaster and the road foreman of engines, who held the investigation;" that the discipline imposed in the six investigations in question was fair and reasonable, and was the same as that imposed upon other employees for like offenses; that witness never heard at any time during the period in which the plaintiff was being disciplined that Reinhart, Ellas, or Perkins felt unkindly towards him; that in every case witness notified the plaintiff in writing of the number of demerits applied against his record; that witness did not recall that the plaintiff had ever made an appeal to reopen any case, and that had he done so, he would have been requested, as was the custom, to state why he wished the investigation reopened, and whether he had any additional evidence; that as to the Millen incident witness "examined the record, the Brown System discipline book, . . . and the conduct of engineer Gary in that affair justified his permanent dismissal from the service;" witness dismissed the plaintiff from the service "because of his conduct down at Millen and that investigation;" that witness was familiar with the portion of article 31 of the contract between the Brotherhood of Locomotive Engineers and defendant which provided that "No engineman shall be demerited, suspended, or discharged from the service of the company without a fair and impartial trial," and that this provision was complied with; that witness reviewed each investigation as it was made; that witness made the decision as to the plaintiff's discharge, upon recommendation of the trainmaster and road-foreman of engines; that the only investigations the master mechanic and the trainmaster ever held were for violation of rules and for poor service and things of that kind; that if the party on

trial was found guilty he was demerited; that these might be called "disciplinary investigations;" that when an engineer appeals his case the evidence is gone over and he is advised that the case will not be reopened unless there is additional evidence; that witness remembered only one appeal being made by the plaintiff, and that no proper reason was shown why that should be granted; that the investigating board did not have the right to discharge employees, but that "they recommend their findings to the superintendent, and he does it;" that the "Brown System" had never been written into the contract of 1922; that it was devised by a man who had been in the railroad service in order that demerits might be substituted for suspensions, and for the benefit of the families of the employees; that under it an accumulation of ninety demerits, "after the cases were gone over and reviewed, would justify an employee's dismissal from service;" that the defendant, among a number of other carriers, was operating under this system; that it was the duty of the investigating board to procure witness for the employee on trial when so requested; and that when an employee is discharged it makes it hard for him to get employment with other railroads.

Plaintiff's service record was next introduced in evidence, one item being as follows: "June 9th. For violation of General Rule E and Rule 990, train 48, May 16, 1924;" and another item being: "For delay to 2d. 37 at Millen and for cursing at Opr. Trapnell, and for refusing to give Disp. on duty information as to when he would be ready to move on July 30, 1924, and for violation of Rules 800, 801, and 802. Permanently dismissed from service of the company Aug. 8, 1924, for disloyalty, unsatisfactory service, having (90) demerits charged against his record." Plaintiff's record showed credits of 30 points for "clear record." Here several witnesses testified that cursing was usual among railroad employees.

W. H. Wright, recalled for the defendant, testified that the defendant was engaged in interstate commerce.

There was next introduced in evidence "Circular No. 16," issued from the general manager's office on May 26, 1911, purporting to establish the Brown System on the defendant's railroad system. Having set out the pertinent parts of said circular in the defendant's answer, it is unnecessary to repeat it here. It may be noted, however, that one provision of that circular is that an employee

shall be subject to summary dismissal for "insubordination, incompetency, wilful neglect, inexcusable violation of rules resulting in endangering or destroying company property, making false statements, or concealing facts concerning matters under investigation." Here was introduced a brief of the testimony at the Millen investigation, which has been sufficiently covered already. Next was introduced a "Brief of memorandum of agreement between the railway companies signatory hereto and the Brotherhood of Locomotive Firemen and Enginemen . . on the creation of a regional board of adjustment for the southeastern region." Among other things, this memorandum provides for a train service board of adjustment, with power "to conduct hearings and pass upon disputes, when properly submitted." Here, upon the plaintiff's counsel stating that the defendant had in its possession records showing that plaintiff had only eighty-five demerits when he was discharged, counsel for the defendant introduced in evidence the records of the six investigations (with the exception of the incident occurring at Millen on July 30th, the record of which had already been introduced) which resulted in placing ninety demerits against the plaintiff's record.

The special grounds of the motion for a new trial are numbered 5 to 19, inclusive. Special ground 5, complaining that the verdict was contrary to the evidence because the plaintiff had not been credited with "periods of good service," is merely an amplification of the general grounds. Ground 6 complains that the defendant's answer was filed too late and was not properly sworn to. In this case the defendant promptly filed its defense by demurring generally and specially to the petition. The court sustained the general and certain of the special grounds of the demurrer, and dismissed the action. This court reversed the judgment of the trial court in part, and affirmed it in part, and returned the case for trial. No judgment in default was ever entered on the docket, and when the case was returned for trial the defendant for the first time filed its answer to the petition. I am of the opinion that the answer was filed in time.

Whether or not the statement in W. H. Wright's affidavit averring that he was "general agent for the Central of Georgia Railway Company, and is authorized to make the affidavit," showed authority on his part to act for the defendant, it is not necessary to

decide, since under the Civil Code (1910), § 5640, the court had the right to exercise his discretion by not requiring an affidavit at all.

Special ground 7 complains that the court erred in admitting in evidence a copy of the "Brown System," because it was not shown to be a part of the contract of 1922 and was contrary to that contract. This was not error.

Special ground 8 complains that the court erred in admitting a copy of a memorandum of agreement between the defendant and other railroads on one side and the Brotherhood of Locomotive Engineers on the other, dated August 15, 1921, averred to be a part of the subsequent agreement of December 22, 1922, and "intended to show that plaintiff had to apply to said board, created by said document, for any relief, and not to the courts." The objections interposed were: (1) the original was not proved to exist; (2) the original was the best evidence and was not accounted for; (3) said agreement was not shown to be a part of said contract of December 22, 1922; and (4) there was no evidence that the plaintiff had tried to get relief through this board.

A. W. Henderson, vice-president and general manager of the Charleston and Western Carolina Railroad, testified: that he was familiar with the contract offered in evidence; that he did not have a copy thereof; that he did not know of any original in the State of Georgia,. and that he had sent his to Richmond, and did not believe there was one in the State of Georgia. I think the court had the right to conclude that the original was not accessible, and to admit the copy. See Civil Code (1910), § 5759; *Bowden* v. *Achor*, 95 *Ga.* 243 (5), 260 (22 S. E. 254) ; *Stewart* v. *Randall*, 138 *Ga.* 796 (6) (76 S. E. 352). I think the evidence was properly admitted over the objection made.

Special grounds 9 and 10 have reference to the agreement referred to in ground 8, and are controlled adversely to the contentions of the plaintiff in error by my conclusions reached in that ground.

Ground 11 complains that the court erred in allowing a witness to testify that the plaintiff, referring to Superintendent W. H. Wright, said that he "wouldn't knuckle to any son of a bitch." The objection was that there was no charge against the plaintiff for cursing anybody except operator Trapnell, and that the evidence

was irrelevant. The court, in my opinion, properly admitted the evidence.

Ground 12 (perhaps inadvertently) repeats ground 11. In this regard it is controlled by what was said as to ground 11. Ground 12 complains also that W. H. Wright was permitted to testify that the discipline imposed on the plaintiff in the investigations was reasonable, over the objection that it was an opinion. I think that, since the witness as superintendent had handled numberless cases, and had considered the records of the cases in question, his evidence was admissible.

Ground 12-1/2 complains of excerpts from the charge of the court comprising about two and a half pages of the record. The main ground of complaint is that the court erred in using the word "plaintiff" instead of "defendant" when he was stating the latter's contention that it was operating under the "Brown System." This was a verbal inaccuracy which was manifestly harmless and does not warrant a new trial. For no reason assigned in this ground did the court commit error.

Ground 13 complains that the court charged that on May 26, 1911, there was inaugurated by the proper method into the operation and relationship of the railroad and its employees this working arrangement, made a part of the contract, and what is known as the "Brown System." Considering the court's charge as a whole, the foregoing was not reversible error; nor does this ground indicate any such error.

Ground 14 complains that the court erred in charging in substance that if the plaintiff had had a fair trial at the various investigations and had been given ninety demerits, and the superintendent passed upon the record, he would have a right to discharge the plaintiff. The contention is that this charge is contrary to the decision of this court in 37 *Ga. App.* 744 (supra ). That decision, of course, related solely to the petition and the demurrer, while the court here had to deal with the defense which was subsequently filed. I do not think that this ground discloses reversible error.

Ground 15 is so very like the previous ground that it needs no special consideration, except to say that it is without merit.

As to ground 16, I shall only say that in the absence of any request, the court did not err in failing to instruct the jury how they could determine whether or not the plaintiff had ninety demerits.

Ground 17 complains of the following excerpt from the charge: "Employees who are dishonest, immoral, or quarrelsome will not be retained in the service. Disloyalty or dishonesty, wilful neglect, inexcusable violation of rules resulting in the damaging or destroying of the company's property. I charge you that the violation of any of those would work an engineman's discharge, if he was notified of such charge and fairly and impartially tried." Error was alleged because "Gary had at no time been charged with or tried for a violation of said rules," and because he had never been tried upon the issue of "discharge or not" under any proper rules, the rules quoted being no part of the contract of December 22, 1922. It is not at all probable that this charge misled the jury, and it is not erroneous as alleged.

Ground 18 complains that the court erred in charging that if the plaintiff should be entitled to recover he should be awarded a verdict in such amount as the evidence warranted; it being contended that the true measure of damages was "full pay at the contract rate," and that the charge was no guide to the jury. This charge at least gave the jury large latitude in reaching a verdict for the plaintiff, and, since the jury found against him, it is most improbable that he could have been harmed thereby. Furthermore, there was no other or further request for any charge upon damages.

Ground 19 contains a request to charge regarding the number of demerits that the plaintiff had at the time of his discharge. This request very closely approaches a request to the court to direct a verdict for the plaintiff. The court properly refused to comply with it.

It is evident from the jury's verdict, and from the trial judge's approval of the verdict, that both jury and judge were of the opinion that the plaintiff had been accorded all his rights, and had been properly and legally discharged. Under the record in this case, and under the rule of decision of this court as to facts, I decline to say that both court and jury were wrong. The jury, as they had the right to do, believed that Gary was guilty of inexcusable conduct and of using the most profane language while on duty, and of having applied the vilest of epithets to those under whom he was working. Upon the issues of fact the appellate courts can only follow the findings of the jury where there is any evidence

to authorize such findings; and in this case there was. I think the judgment should be affirmed.